**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JOSHUA RAMSEUR,**<br>Plaintiff,<br>v.<br>**HUNG CAO,** Secretary of the Navy (Acting),<br>Defendant. | Case No. 1:25-cv-02271 (TNM) |

**MEMORANDUM OPINION**

Lieutenant Joshua Ramseur was honorably discharged from the U.S. Navy and joined the Navy Reserve. Ramseur has multiple sclerosis. After leaving active duty, Ramseur asked the Navy to correct two entries in his record: remove a punishment for drunk driving and change his discharge to a medical retirement. The Board for Correction of Naval Records found those changes unnecessary. Ramseur sued the Secretary of the Navy[1] under the Administrative Procedure Act, calling the Board's decisions arbitrary and capricious. But the Board had ample reason to think that there was neither error nor injustice to be corrected. So the Court will grant the Acting Secretary's motion for summary judgment.

[1] Acting Secretary Hung Cao replaced the former Secretary, John Phelan. Under Federal Rule of Civil Procedure 25(d), when a public officer sued in an official capacity vacates the office while the action is pending, his successor is automatically substituted as a party.

## I.

Ramseur commissioned as a Naval officer in 2010, serving on active duty until his 2022 involuntary separation for failure to promote. *See* AR 1–2. He was diagnosed with multiple sclerosis (MS) in 2013. That diagnosis underpins his two requests to correct his military record.

The Secretary of the Navy "may correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). To evaluate requests, the Secretary created the Board for Correction of Naval Records. *See* 32 C.F.R. § 723.2. "The Board relies on a presumption of regularity," and will not find error or injustice without "substantial evidence." *Id.* § 723.3(e)(2).

### A.

In 2012, Ramseur fell asleep at the wheel of his car while he queued at a checkpoint to enter a naval base. *See* AR 1351. Police woke him, and Ramseur admitted that he had imbibed three drinks. *See* AR 1372. Then he failed three field sobriety tests. *See* AR 1351. Police tried to administer a breath test, but Ramseur could not provide a sample. *See* AR 1393. Three hours later, Ramseur gave a sample on his ship's breathalyzer, where he blew a blood-alcohol content (BAC) of .071. *See* AR 1393.

Ramseur's commanding officer found him guilty of drunken or reckless operation of a vehicle in violation of the Uniform Code of Military Justice (UCMJ), issued a Punitive Letter of Reprimand, and entered a non-judicial punishment in his record. *See* AR 1388, 1390. Ramseur appealed, arguing that his breathalyzer-BAC was below the legal limit in California. *See* AR 1394. The appeal was denied. *See* AR 1396. A few months later, Ramseur wrote a letter to his superiors, expressing his "deepest regret that [he] decided to get behind the wheel of a car that night," that he "learned from this experience," and now is "mentor[ing] other sailors and officers

of the proper way to drink responsibly." AR 1397.

In 2023, Ramseur asked the Board to remove the punishment from his record. *See* AR 1354. In support, his neurologist stated that while Ramseur was diagnosed with MS in 2013, he likely was experiencing "more subtle symptoms" in 2012, including "imbalance." AR 1405. A military physician also opined that, in general, MS can cause alcohol-related impairments to appear at lower BAC levels. *See* AR 1406. The Board's Physician Advisor agreed with Ramseur in an advisory opinion. *See* AR 1383. He wrote that "the preponderance of objective clinical evidence" supports Ramseur's "contention that at the time of his charged DUI, he was likely experiencing clinical symptoms related to his developing MS condition." AR 1383. Ramseur also alleged that the police's conduct was tinged with racist assumptions. *See* AR 1365.

The Board rejected Ramseur's request. *See* AR 1349. It found no evidence of racial bias, *see id.,* and he does not press that allegation here. And, while it accepted the testimony that Ramseur's MS contributed to his conduct, it saw no evidence that his MS affected his elevated BAC three hours after the traffic stop. *See* AR 1348.

**B.**

Ramseur's second request involves his 2022 discharge before going through the Navy's Disability Evaluation System. That System implements the Secretary's obligation to determine service members' fitness for duty and entitlement to disability benefits. *See* 10 U.S.C. § 1216; *Havens v. Mabus*, 759 F.3d 91, 92–93 (D.C. Cir. 2014).

The System has three main steps. First, if a doctor believes that a medical condition may stop the soldier "from reasonably performing the duties of their office," represents an obvious risk to other soldiers, or "imposes unreasonable requirements on the military," she refers the

soldier to a Medical Evaluation Board (MEB). Dep't of the Navy, Disability Evaluation System Manual (SECNAV M-1850.1) ch. 1, at 2-3 (2019). Next, the MEB determines whether the condition in fact prevents the service member from reasonably performing his job. *See id.* at 3-2. If it does, the case moves to a Physical Evaluation Board (PEB) for a final finding of fitness for military service. *See id.* at 4-1. The PEB's determination itself has two parts. First is an informal PEB finding of fitness. *See id.* at 4-2. If the soldier is found to be unfit for service and disagrees, he can request a formal PEB hearing. *See id.* at 4-3.

Ramseur first went through the Disability Evaluation System in 2018. His initial medication did not control his MS symptoms, and a doctor referred him to the MEB. *See* AR 68, 1369. The MEB found him unfit for duty, as did the informal PEB. *See* AR 45, 68. But Ramseur wanted to continue to serve. *See* AR 1369. More, he started a new medication (Tysabri) that "100% controlled" his condition. AR 1125. Tysabri is administered by intravenous (IV) injection every 28 days. *See* AR 1368.

So Ramseur marshalled evidence—doctor's notes and letters of support from his superiors—that his disease and its treatment would not interfere with his duties. *See* AR 1, 1125. The formal PEB agreed, stipulating that Ramseur was fit to serve. *See* AR 13. And serve he did, earning a medal for "meritorious service." AR 2.

But his old drunk driving citation continued to haunt him. In 2022, Ramseur was passed over for promotion for the second time. As a result, he was set for involuntary separation from the Navy on February 28. *See* AR 1377; 10 U.S.C. § 632. Suddenly, Ramseur wanted a PEB do-over: having previously resisted an unfitness finding, he now sought it. He asked to be reviewed by the PEB again, and for his separation to be delayed. *See* AR 8. His separation date was pushed back one month, and he was placed on limited duty. *See* AR 1127, 1377.

Before separation Ramseur underwent two examinations by the same doctor. In the first, on February 10, an Abbreviated Medical Examination Board recommended limited duty while "being processed by local MEB Providers for referral into [the Disability Evaluation System]." AR 1128. It noted that Ramseur's MS was under "[g]ood control on current medication" with "No Evidence of Disease Activity," but that without the "current plan, prognosis is poor." AR 1131. It explained that his neurologist needed to monitor him every four months for a brain infection—a side effect of the medication keeping his symptoms at bay. *See* AR 1131; 1115.

The doctor tried to send Ramseur back through the Disability Evaluation System. Ramseur was assigned an attorney and PEB Liaison Officer who told him to submit his medical records to the medical board. *See* AR 1376. But, due to administrative delays from COVID-19, he "was not fully gained [sic] in the MEB/PEB network" before his separation. AR 1370.[2]

The second examination was a mandatory separation physical on February 24. *See* AR 2; Dep't of the Navy, Manual of the Medical Dep't (MANMED) ch. 18, at 18-70 (2005). The same doctor checked the box indicating that Ramseur "IS NOT MEDICALLY QUALIFIED" for separation. AR 1174. Yet the doctor noted that Ramseur was not referred for further evaluation. *See* AR 1177.

Two days before Ramseur's separation date, the Assistant Secretary of the Navy denied his request to defer his separation. *See* AR 8. He explained that separation deferment is possible if he determines that evaluation cannot be completed without "hospitalization or medical observation that cannot be completed with confidence in a manner consistent with the Service member's well-being before the date on which the officer would otherwise be required to retire

---

[2] It was not until a month after leaving active duty that Ramseur was told that he was next in line for the System's intake processing. *See* AR 1377.

or separate." AR 1130 (citing SECNAV M-1850.1 ch. 4, at 4-28). And he stated that there were "no pending disability determinations" and "no actions pending a physical evaluation board evaluation." AR 1130. So Ramseur's separation was not deferred.

Immediately after leaving active duty, Ramseur joined the Navy Reserve. *See* AR 2. He thrived, earning rave reviews as a "TRANSFORMATIONAL OFFICER" with "ZERO Daylight" between him and the top-performers. AR 1346. His Fitness Reports also found him physically fit—he met the standard in 2023 and exceeded it in 2024. *See* AR 1337, 1345.

But Ramseur still thought that he should have been medically retired. And he believed that the Assistant Secretary's refusal to delay his separation "to complete [his] application to the Physical Evaluation Board" was "an injustice." AR 1103. So he petitioned the Board to upgrade his separation to a medical retirement. *See* AR 1101.

The Board rejected his request. It considered his medical history and doctors' notes and found "no error or injustice in" either denying Ramseur's request for deferral or separating him from active duty. AR 4. It emphasized that Ramseur was self-evidently fit to continue service, and that he was not entitled to a deferral. *See* AR 2–3.

Ramseur sues under the Administrative Procedure Act (APA). *See* Compl., ECF No. 1. He alleges that the Board acted arbitrarily and capriciously when it preserved his drunk driving punishment and involuntary separation. *See id.* ¶¶ 41–49; 5 U.S.C. § 706(2). The parties cross-move for summary judgment. *See* ECF Nos. 15, 18. The Court has jurisdiction under 28 U.S.C. § 1331.

**II.**

Courts must "set aside agency action" that is "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2). In an APA case, the Government is entitled to

summary judgment if, as a matter of law, there is a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). But if an agency gives an explanation that "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view," its decision cannot stand. *Id.*

In an arbitrary-and-capricious challenge, courts start with the agency's authorizing statute. *See Howes Leather Co. v. Golden*, 681 F. Supp. 6, 12 (D.D.C. 1987). The applicable statute gives wide discretion to the agency: "The Secretary of a military department *may* correct any military record of the Secretary's department when the Secretary *considers it necessary* to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis added). This language "fairly exudes deference" to the Secretary. *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (quoting *Webster v. Doe*, 486 U.S. 592, 600 (1988)). And the Board presumes that official actions are proper and will deny an application only if substantial record evidence supports an applicant's claim. 32 C.F.R. § 723.3(e)(2).

For that reason, courts apply "an unusually deferential application of the 'arbitrary or capricious' standard." *Kreis*, 866 F.2d at 1514. This exceptional deference stems from the statute's "broad grant of discretion." *Roberts v. United States*, 741 F.3d 152, 158 (D.C. Cir. 2014) (quoting *Kries*, 866 F.2d at 1514). The Board may decide not "to correct even an undisputed error or to remove even a conceded injustice." *Kries*, 866 F.2d at 1514. More, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (cleaned up). The parties agree that Ramseur must meet this "exceedingly high" standard. *Powers v. Donley*, 844 F. Supp. 2d 65, 74 (D.D.C. 2012).

### III.

Neither of Ramseur's claims meet that standard. The Board adequately considered Ramseur's arguments and supported its decision with record evidence. *See Buckingham v. Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011).

### A.

Ramseur argues that the Board's failure to remove his nonjudicial punishment for drunken or reckless operation of a vehicle is arbitrary and capricious. *See* Pl's Mem. ISO Mot. Summ. J. at 15, ECF. No. 15. In short, he argues that he must have either been drunk *or* experienced MS symptoms, and since there is medical evidence of MS, he must not have driven drunk. This is a false dichotomy. There he no reason that he could not have been suffering MS symptoms *and also* be inebriated.

He first points to evidence that, "at the time of his charged DUI, he was likely experiencing clinical symptoms related to his developing MS condition, as well as an exaggerated effect from his earlier alcohol ingestion that mimicked a higher BAC level." *Id.* (quoting AR 1383). On his telling, the Board either ignored or unreasonably rejected uncontroverted evidence that his MS caused his punishment.

Yet the Board did no such thing. Far from ignoring Ramseur's MS, it credited it, and agreed that "there is clinical evidence that you had been experiencing the initial symptoms of your MS condition at the time of your incident." AR 1348. Instead, it reasoned that "even assuming arguendo that you were exhibiting MS symptom[s] during your [field sobriety tests], . . . there is insufficient evidence your MS had any nexus to your .071 BAC level three hours after the incident." AR 1348.

The evidence supports that conclusion. Ramseur points to nothing connecting his MS to his BAC. Both his and the Board's doctors opined on MS' impact on symptoms like balance and dizziness—not on BAC. *See* AR 1382, 1406. The Board already discounted Ramseur's three failed sobriety tests and inability to provide a breath sample on the scene, so his objections fall flat.

Next, Ramseur alleges that his .071 BAC three hours after his stop cannot be relevant evidence that he was intoxicated because it was below the legal limit (.08 in California). Pl's Mem. at 18. He posits that the UCMJ presents two theories of drunk driving liability: A behavioral "impairment" theory, and a BAC-tied "per se" theory. *Id.* at 17 (discussing Art. 111, 10 U.S.C. § 911). And since the Board concurred that his MS symptoms mitigate his failed field sobriety tests, the only evidence remaining is his BAC, below the "per se" legal limit.

Not so. The Board relied on compelling, relevant evidence that Ramseur was drunk under the "impairment" theory. *See* AR 1348. Ramseur affirmed that he drank irresponsibly that night and expressed his "deepest regret" at his "poor decision." AR 1397. He confessed to having three drinks before getting behind the wheel. AR 1372. And he "admi[tted] to operating a vehicle after ingesting alcohol." AR 1348. Ramseur never addresses those confessions.

His just-under-the-legal-limit BAC three hours later is also inculpatory, not exculpatory. After all, "an individual's alcohol level gradually declines soon after he stops drinking . . . ." *Missouri v. McNeely*, 569 U.S. 141, 152 (2013). A BAC very nearly over the legal limit three hours after the traffic stop "reasonably indicates that [Ramseur was] under the influence of alcohol while operating [his] vehicle." AR 1348. And a "BAC over the state legal limit is not required." AR 1348. Substantial evidence supports the Board's conclusion that there was not

"probable material error or injustice." AR 1347; *Kight v. United States*, 850 F. Supp. 2d 165, 175 (D.D.C. 2012), *aff'd,* 2013 WL 1164035 (D.C. Cir. Mar. 1, 2013).

**B.**

Ramseur's second request also comes up empty. He says that he should have been medically discharged, or at least allowed to go through the Disability Evaluation System, before separating from service. Pl's Mem. at 19. In support, he points to a smattering of bureaucratic regulations and his two visits with the same doctor in the month preceding his separation. But he cannot reverse the Board's decision.

Ramseur first raises a new issue: His separation physical mandated automatic referral to the Disability Evaluation System. *See id.* at 19. He did not make this argument before the Board. *See* AR 1101 (arguing only that the rejection of his request to defer separation to complete the evaluation process was unjust). The Court cannot consider it now. *Accord Buckingham*, 772 F. Supp. 2d at 301. Issues not raised before the agency—even interpretive issues—cannot be considered on review. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297–98 (D.C. Cir. 2004).

And even if it was not forfeited, Ramseur's mandatory-evaluation argument would fail. Servicemen "suspected of having a medical condition that precludes continued military service will be referred" for further examination. DoDI 6040.46 § 1.2(e). But his separation physical evidently did not raise any suspicions of a condition that precluded future service: The doctor did not refer Ramseur for future evaluation, and Ramseur continued Naval service immediately upon separation. AR 9, 1177; MANMED ch. 15, at 15-17 ("If a Service member is found not to be physically qualified for separation, the planned course of action (e.g., referral to PEB) should also be stated."). Plus, as the Board noted, "it is critical to remember that the mere presence of a

'check in the block' on the separation physical paperwork neither prima facie indicates a condition barring on-time release from active duty, nor translates into automatic referral to the PEB." *Id.* ch. 18, at 18-72; AR 4.

The core of Ramseur's argument is that his separation should have been delayed because the determination of his entitlement to "separation for physical disability require[d] hospitalization or medical observation and [] such hospitalization or medical observation [could not] be completed with confidence in a manner consistent with the member's well being before" separation. AR 3; 10 U.S.C. § 640(a) (incorporated in SECNAV M-1850.1 ch. 4, at 4-28). The Secretary "may defer" separation in his discretion. *Id.* The Assistant Secretary declined to do so because there were "no pending disability determinations" and "no actions pending [PEB] evaluation." AR 1130.

Substantial evidence supports the Board's decision not to disturb the Assistant Secretary's finding. *See* AR 4. For starters, there is no evidence that Ramseur required "hospitalization," nor does he argue otherwise. More, he only implicitly engages with the "medical observation" prong.

Ramseur says that he "had proceeded significantly through the [Disability Evaluation System] process at the time of his separation." Pl's Mem. at 25. Not quite. The evaluating Board that he calls a "MEB," *id.* at 26, was actually an "Abbreviated" MEB, AR 1128. An Abbreviated MEB is not part of the Disability Evaluation System and is "primarily used to place members in [limited duty] status." *O'Brien v. United States*, 120 Fed. Cl. 85, 91 (2015). Rather, an Abbreviated MEB can start the referral process *into* the System. *See* MANMED ch. 18, at 18-57. So this visit did not require hospitalization or medical observation.

Nor do Ramseur's regular doctor's appointments move the needle. His monthly IV injections and periodic neurologist visits could—and did—continue after he left the service. *See* AR 1115, 1370–71. And "[f]or patients whose care is deferrable and/or elective, it is not appropriate for [Military Treatment Facilities] caring for patients with an impending separation date who present with conditions for which care is deferrable and elective to attempt to forestall the established separation or retirement date." MANMED ch. 18, at 18-70. Here, separation was "consistent with the member's well being." 10 U.S.C. § 640(a)

The same goes for his allegedly worsening condition. *See* Pl's Mem. at 30–31. His doctor and the Abbreviated MEB confirmed that there had been "No Evidence of Disease" activity since 2017, and that there is "[g]ood control on current medication." AR 1115, 1131, 1405. Speculation on what may happen if Ramseur were to voluntarily abandon his treatment plan is of no moment. *See* AR 1131, 1370 (affirming that Ramseur continues treatment). In sum, Ramseur has provided no evidence to disturb the Assistant Secretary's finding that "there is no legal authority to defer separation," or that he was "unable to perform the duties of [his] office and rank." AR 5, 1130.

Ramseur says that the Board erred in finding him fit without a new PEB evaluation. Pl's Mem. at 30–31. But the Board plausibly focused on the most probative evidence of his fitness to serve—the fact that he is "capably and successfully serving" in the Navy Reserve. AR 5. Therefore, the Board explained, there was no injustice in not letting Ramseur go through the process that might have declared him unfit for service, because he *was subsequently declared fit for service*. *See* AR 4-5. Not only was Ramseur fit, but he was also above average in physical readiness and job performance. *See* AR 2–3, 1337, 1345.

True, Ramseur's processing into the System was hampered by COVID-related delays. *See* AR 1377. But recall that the system puts a thumb on the scale for not delaying previously scheduled separations. *See* 10 U.S.C. § 640; MANMED ch. 18, at 18-70; DoDI 1332.18 § 6.5 ("Service members who are pending retirement at the time they are referred for disability evaluation will be presumed fit for military service."). The Board was free to decline Ramseur's request "to correct even an undisputed error or to remove even a conceded injustice" if it finds a "lack of harm to the person in question." *Kreis*, 866 F.2d at 1514. The Board found so here. Courts do not "serve as a super correction board that reweighs the evidence." *Charette v. Walker*, 996 F. Supp. 43, 50 (D.D.C. 1998). On this record, and under this deferential standard of review, the Court will not disturb the Board's decision.

**IV.**

For all these reasons, the Acting Secretary's cross-motion for summary judgment will be granted, and Plaintiff's motion for summary judgment will be denied. A separate Order will issue.

2026.10.22
09:30:45 -04'00'

Dated: October 22, 2026

TREVOR N. McFADDEN
United States District Judge